**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSHUA MCCORMACK,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   **CIVIL ACTION NO. 21-1198** |
| | ) |
| **KILOLO KIJAKAZI,** | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION

CONTI, Senior District Judge.

### I.     Introduction

Plaintiff Joshua McCormack ("McCormack" or "plaintiff") appealed from the final decision of the Acting Commissioner of Social Security ("Commissioner" or "defendant") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83. McCormack argues, among other things, that the decision of the administrative law judge (the "ALJ") that he is not disabled, and, therefore, not entitled to SSI, is not supported by substantial evidence. The Commissioner argues that the ALJ's decision is supported by substantial evidence and should be affirmed.

The parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The court will grant summary judgment in favor of the Commissioner and deny McCormack's motion for summary judgment because the ALJ's decision is supported by substantial evidence of record and McCormack did not point to any other basis upon which this court may grant him relief.

### II.     Procedural History

On November 17, 2016, an application for SSI was filed in McCormack's name alleging that as of October 24, 2016, he was disabled because of his autism, anxiety, thyroid, and elevated triglycerides. (ECF Nos. 6-5 at 3-13; ECF No. 6-6 at 73; 168-177.) On January 1, 2017, McCormack's application was denied. (ECF No. 6-3 at 92-104.) On February 11, 2017, McCormack requested a hearing. (ECF No. 6-4 at 7-8.) McCormack's claim was forwarded to the Office of Disability Adjudication and Review. (ECF No. 6-4 at 10-12.) On October 9, 2018, a hearing was held before an ALJ at which McCormack, McCormack's mother (Jackie McCormack), and a vocational expert (Sam Edelman ("Edelman")) testified. (ECF No. 6-2 at 45-86.)

On February 5, 2019, the ALJ issued a decision denying McCormack's claim for SSI finding that McCormack is not disabled. (ECF No. 6-2 at 25-44.) The ALJ explained that McCormack is capable of performing unskilled medium occupations, including floor waxer, hand packager, and industrial cleaner. (Id. at 44.) McCormack appealed the unfavorable decision to the Appeals Council. (ECF No. 6-2 at 24.)

McCormack submitted to the Appeals Council written argument and evidence with respect to his alleged disability that was not submitted to the ALJ. (ECF No. 6-2 at 3.) The Appeals Council denied McCormack's appeal and explained that some of the additional evidence was beyond the time properly considered by the ALJ and that, even if the ALJ considered the additional evidence, the outcome of the case would have been the same. (Id.) The Appeals Council's decision rendered the ALJ's decision the final decision of the Commissioner. (ECF No. 6-2 at 2.)

On September 8, 2021, McCormack filed the above-captioned case seeking review of the ALJ's decision denying him SSI. (ECF No. 1.) On November 12, 2021, the Commissioner filed

an answer to the complaint. (ECF No. 5.) On the same day, a certified copy of the transcript of the proceedings before the Social Security Administration was filed with this court. (ECF No. 6.) On January 18, 2022, McCormack filed his motion for summary judgment and brief in support of the motion. (ECF Nos. 9, 10.) On February 18, 2022, the Commissioner filed its motion for summary judgment and brief in support of the motion. (ECF Nos. 11,12.) The motions for summary judgment having been fully briefed are now ripe to be decided by the court.

### III.    Background

#### A.  Medical Conditions

McCormack claims he is disabled because of his autism, anxiety, thyroid, and elevated triglycerides. (ECF Nos. 6-5 at 3-13; ECF No. 6-6 at 73; 168-177.) In 2001, McCormack—at the age of 4 ½ years—was diagnosed with Autistic Disorder. (ECF No. 6-6 at 17, 90.) By June 2013, McCormack was also diagnosed with, among other things, Generalized Anxiety Disorder and thyroid disease and was taking various medications.[1] (ECF No. 6-6 at 26, 73.) According to McCormack, he became unable to work because of his disabilities on October 24, 2016. (ECF No. 6-6 at 73.) The ALJ in this case considered McCormack's alleged disabilities from October 24, 2016, through February 8, 2019. (ECF No. 6-2 at 3.)

#### B.  Personal Characteristics

McCormack's birthday is July 29, 1996; as of the date of the hearing before the ALJ, he was twenty-two years old. (ECF Nos. 6-2 at 48; 6-5 at 4.) He loves to encourage other people. (ECF No. 6-6 at 147.) He prefers environments that are structured, organized, and not chaotic. (ECF No. 6-6 at 148.) He can carry on a conversation, listen, interact, respond, and ask

---

[1]     McCormack takes the following medication for the following reasons: Ativan—anxiety; Zoloft—anxiety and depression; Lipitor—high cholesterol and triglycerides; Latuda—mood; Depakote—mood; Levotheyroxine—thyroid; and Prazosin—post-traumatic stress disorder. (ECF No. 6-6 at 134.)

questions. (ECF No. 6-6 at 148.) With respect to vocational skills, McCormack is, among other things: a hard worker; reliable; articulate; a good listener; good at following directions; a good public speaker; empathetic; a good communicator; willing to ask for help; able to problem solve on his own; and able to take suggestions and apply the suggestions. (ECF No. 6-6 at 148-49, 154.)

### C.  Home Activities and Hobbies

McCormack wakes up at approximately 10:00 a.m. (ECF No. 6-2 at 51.) He makes his breakfast, e.g., cereal, toast, eggs, and places his dirty dishes in the sink. (Id.) He "fix[es]" his bed about an hour before he goes to sleep. (Id.) After breakfast, he plays video games for approximately three to five hours. (Id. at 50-51.) McCormack has three gaming systems. (Id.) McCormack can prepare simple meals, e.g., "boiled pasta, box macaroni and cheese, microwave meals/pizza, toast, yogurt, [and] cereal." (ECF No. 6-6 at 90.) He can also prepare dishes that require multiple steps, e.g., spaghetti bread bowls and an Oreo dessert. (ECF No. 6-6 at 146.) He can follow directions to complete a task, such as building a bookshelf. (ECF No. 6-6 at 147.) Most days McCormack needs reminders to comb his hair and brush his teeth. (ECF No. 6-6 at 90.)

At home, McCormack does the landscaping, which includes mowing the lawn, trimming, and leaf maintenance. (ECF No. 6-2 at 60.) He mows the grass approximately once or twice a week dependent upon how the grass grows and the weather. (Id. at 60.) McCormack also mowed his neighbors' lawn for $30.00 per week. (ECF No. 6-6 at 132.)

McCormack is a musician and plays seven instruments. (ECF No. 6-2 at 52.) He took private music lessons outside high school. (Id. at 55.) He plays his guitar and bass guitar daily. (Id. at 52-53.) He spends approximately one hour to one hour and thirty minutes each day

playing his instruments. (Id. at 53.) McCormack plays three instruments for the praise band at his church. (Id. at 53-54.) The praise band practices before church services and plays one to two church services per month. (Id. at 53-54.) The church services last one hour. (Id. at 54.) In 2016, McCormack played music for his church's festival. (Id. at 54-55.) McCormack records his own music on his computer. (Id. at 59.)

McCormack used to attend a card game with ten to twenty people at a comic bookstore, but as of the date of the hearing before the ALJ, he had not attended the card game in three to four months. (Id. at 53.) The card game could last four hours and thirty minutes. (Id. at 53.) His father dropped him off at the card game and McCormack would use his cellular telephone to call his father when the game ended and he was ready to go home. (Id. at 53.)

McCormack does not have his driver's license. (ECF No. 6-2 at 53.) Other than gaming and recording music, McCormack uses his computer to watch YouTube videos on a variety of subjects. (Id. at 60.) McCormack testified that he does not have many friends and has extended family in Philadelphia, Pennsylvania. (Id. at 61.) While McCormack has "very few" friends, he is close with his friends. (Id. at 64.)

### D. Education

McCormack graduated from high school in 2015, but did not receive his diploma until 2017 because he was in "an extended program." (ECF No. 6-2 at 48.) He had a 4.0 grade point average. (ECF No. 6-6 at 144.) McCormack did not receive academic support throughout high school; rather, he received emotional and behavioral support. (ECF No. 6-6 at 25.) In April 2013, he attended Wesley Spectrum STEP because he required a more structured environment. (ECF No. 6-6 at 25.) In the summer of 2013, he was transitioned to the "ASD self-contained classroom"

at Wesley Academy for Extended School Year Services. (Id.) He began his eleventh-grade year at that school. (Id.)

The "extended program" took place at City Connections, which McCormack attended five days per week from 8:00 a.m. until 3:00 p.m. (ECF No. 6-2 at 48.) McCormack learned vocational skills, including interview preparation, workplace readiness, and using the transit system. (Id. at 48-89.) After completing the extended program, McCormack did not pursue employment because his psychologist, Dr. Marissa Slider ("Dr. Slider"), recommended that he not pursue employment until he was "emotionally ready" to do so. (Id. at 49-50.) Dr. Slider works on medication management with McCormack and coping skills. (ECF No. 6-2 at 66.) Dr. Slider told McCormack that once he progressed further in treatment, he would be ready to pursue employment. (Id. at 50.) As of the date of the hearing before the ALJ, McCormack was still seeing Dr. Slider for treatment, but had been cleared to work. (Id. at 50, 56-57.)

### E.  Employment

McCormack previously provided janitorial service for minimum wage pay at a high school. He also worked at a nursing home, but that employment did not work out. (ECF No. 6-2 at 65.) McCormack explained:

> It was too stressful. The environment, to me, was depressing. I'm very emotionally sensitive and seeing the elderly in pain—some of them were in serious pain, some of them would get confused and upset. It was very difficult seeing people in a place they didn't want to be.

(ECF No. 6-2 at 66.)

At the time of the hearing before the ALJ, McCormack had been employed for three weeks by Snapology, which he described as a small facility and "a place for kids who like LEGOS and Minecraft and animation, who have social difficulties to interact in a group setting." (ECF No. 6-2 at 57-58.) McCormack maintained the computers used by the children. (Id. at 57.)

His mother drove him to work. (Id. at 57.) He worked Wednesdays and Thursdays from 12:00 p.m. to 4:00 p.m. and made $9.50 per hour. (Id. at 57-58.) He worked with five to six other adults and on about twenty laptop computers. (Id. at 58.)  McCormack reported that he did not have any problems with the adults with whom he worked or the children at Snapology. (Id. at 61.)

McCormack obtained his job with Snapology via "a branch of ODR called the Discovery Program." (ECF No. 6-2 at 63.) The Discovery Program is "a customized employment program where…a representative…spend[s] about six months getting to know…[a person and how the person] function[s]…at home and in society." (Id. at 63.) The person is then paired with a job. (Id.) McCormack testified that he required a job where he is "constantly busy[,]" but not a job that is "too demanding[;]" otherwise, he will become anxious. (Id.)

McCormack's mother testified before the ALJ about an incident that occurred when she was driving McCormack to his second day of work at Snapology:

> The first week he did great—came out—he was in a good mood—he liked the job. The second time he went to work he—as we were driving into work, he started to escalate in the car and his thinking got distorted and by the time we got to the—to the place of employment, he was threatening to take the car. He was demanding that we get out of the car, so he could take the car and just—you know—cross the lines of the state and get out of the country and he was demanding that we pay him $50 a day for every—for all the additional turmoil that he's had. And he was not—started kicking the back of the seat of the car and we just really try to deescalate him by sometimes agreeing with him and sometimes supporting him and saying—you know—you're going to be late for work. They are expecting you to come in here. I'll get out of the car, and then I have to walk in to the building and call for somebody to give me a ride home if you take our car. Got out of the car— he was worried that I was going to call the police because he was escalated. I said, I'm just gonna go in, I'll walk in with you. And he—he said, okay. And he did walk in with me and then he said, don't you say anything about this—that happened in the car. And I didn't—I—I walked into the door, and went in and he finished the shift and he was okay.

(ECF No. 6-2 at 71.)

### F.  Anxiety, Autism, and Depression

McCormack's mother testified that McCormack uses a routine "to make his life easier and feel like he has more control…in his life." (ECF No. 6-2 at 71.) McCormack's mother described McCormack as high functioning, intelligent, and articulate. (Id. at 72.) She testified that McCormack presents himself as highly functional, but that he has "a very high level of anxiety that he internalizes, always" and that at home "he escalates and acts out." (Id.) McCormack's mother worked with Dr. Slider and McCormack's therapist, Daniela Parrish ("Parrish"), and had McCormack use Ativan to help McCormack manage his anxiety. (Id.) His mother testified that McCormack cannot easily manage anxiety or recognize his anxiety before it escalates and cannot be easily managed. (Id.) McCormack has difficulty sleeping. (ECF No. 6-6 at 103.) Medical records show, however, that McCormack showed "significant improvement" from taking Ativan. (ECF No. 6-8 at 53.)

According to McCormack, he has crippling anxiety and depression. (ECF No. 6-2 at 51.) McCormack described his anxiety as follows:

> My anxiety is horrible. It – sometimes it'll reduce me to just laying on the couch as a nervous wreck. I sometimes will not even be able to do things I enjoy, because of my anxiety. It can also make me very agitated and makes it hard for me to sometimes maintain social interactions, for example, with friends.

(ECF No. 6-2 at 64.) McCormack testified as follows with respect to his agitation:

> I have learned to control it but I can go into uncontrollable fits of anger. I will also get incredibly hostel [sic] to even those who are trying to help me[, i.e., his parents]. I will swear and use foul language. And I can become physically aggressive, if provoked.

(ECF No. 6-2 at 64-65.) McCormack testified as follows with respect to his depression:

> It—it cripples my self esteem. I have very low self esteem. I've—from bullying—I don't' really see myself in the best light and when you're felling [sic] like—I kinda [sic] feel like everything it out to—kind of ---not really get me but everything's against me—like the cards are never in my favor. Right now, I kinda

8

[sic] feel hopeless. I feel like I'll never be able to move out of my parent's [sic] place. I want to be independent, but my anxiety makes it very difficult for me to sometimes, even do the simplest things.

…

Like, sometimes just putting my dishes in the sink. I could become forgetful—I can even forget to take my meds at times. My anxiety can even—its even—it even—I can't even do things for fun when my anxiety is inflated. Sometimes even doing a hobby or even my video games—that I enjoy—my anxiety won't be able to calm me down. It is a very serious problem.

(ECF No. 6-2 at 68-69.)

On "rare occasions" McCormack becomes stressed when he is home by himself.[2] (ECF No. 6-2 at 66.) Typically, however, he finds it to be relaxing to be home by himself. (Id.) He has "coping skills" that he uses when he is home alone. He learned the coping skills from Dr. Slider and Parrish. (Id. at 66.) McCormack sees Parrish twice per week. (ECF No. 6-2 at 67.) At the time of the hearing before the ALJ, Parrish was on maternity leave and McCormack saw another therapist. (Id.; ECF No. 6-9 at 86.)

McCormack's mother testified that McCormack's anxiety was "very high" two months prior to the hearing before the ALJ his job at Snapology and changes in their family environment. They increased some of McCormack's medication, i.e., Zoloft and Ativan. (ECF No. 6-2 at 73.) She described McCormack's anxiety escalating when he could not find someone online to play video games and he "bashed" his head into his bedroom door. (ECF No. 6-2 at 75.)

McCormack's mother called the Upper St. Clair Police Department numerous times when McCormack escalated because of his anxiety. McCormack, however, was not arrested and the

---

[2]     McCormack's mother testified about an in incident in which she left McCormack at home by himself when she and her husband (McCormack's father) went to an event. McCormack walked 2.5 miles from their home, called them, started making demands, and said he had to move out of their home. (ECF No. 6-2 at 78.) McCormack's father was able to deescalate McCormack, McCormack waited at a nearby donut shop, and his parents left their event to take McCormack home. (Id. at 78-79.)

police were helpful in those situations. (Id. at 75-76.) Calling the police can further escalate McCormack. (Id. at 80.) He was restrained for his own safety. (ECF No. 6-2 at 65.)

McCormack was involuntarily committed to a hospital twice. (ECF No. 6-2 at 81.) In late January 2017, McCormack—due to his anxiety and problems with medications—was hospitalized on a psychiatric unit for behavior in his family home that posed a threat to himself and others. McCormack's medical records provide that McCormack went from "0 to 60 in one minute" and "[e]scalated very quickly and was very unsafe." (ECF No. 6-9 at 6.) McCormack was upset because he was experiencing leg pain, which was a side effect of his medications. He smashed his mother's and sister's cellular telephones and "became physically and verbally aggressive, threatening to harm himself, [sic] and his family." (Id.) McCormack's mother and sister were able to leave the house, go to their neighbors' home, and call the police. (Id.) McCormack threatened to harm or kill himself and others including his mother on a number of occasions. (Id. at 6, 8, 73.) His behavior resulted in police intervention and property damage in the McCormacks' home. (ECF No. 6-6 at 99.) McCormack missed many days of school in January 2017 because of his anxiety. When he did attend school, he did so for only four hours. (Id.)

February 2017 was the last time McCormack was voluntarily committed. (ECF No. 6-2 at 81.) On or about February 24, 2017, McCormack saw psychiatrist Madhaven Thuppal ("Thuppal") who issued a "Physician's Statement for Homebound Instruction" based upon McCormack's diagnoses of Autism, bipolar disorder, and anxiety. (ECF No. 6-6 at 113, 115.) Thuppal opined that McCormack was not able to attend classes because of his "severe anxiety" and he would require homebound instruction for 6 months." (ECF No. 6-6 at 113.) McCormack, however, has not been hospitalized since working with Dr. Slider. (Id.)

McCormack testified about why he cannot work five days per week, eight hours per day:

I honestly—with putting all resources and accounting for everything that I have that's good for me and that's bad for me—I honestly believe I would be unable to work eight hours a day, five days a week due to my anxiety and I also do have depression and those two make it extremely difficult for me to sometimes, even complete the smallest tasks for  more than even four hours at a time. Even this job right now is incredibly difficult for me.

…

I—my anxiety takes up a lot of energy—dealing with it and keeping it under control. So, I don't have as much energy as say, the average worker. I want to work and I would love to hold a competitive job, but my emotional limitations prevent me from being able to both, do the job and function properly.

(ECF No. 6-2 at 68.)

Parrish, who was McCormack's therapist from November 2014 to August 2018, reported that McCormack's autism makes it difficult for him to manage his anxiety. He struggles when faced with new responsibilities. She explained:

When something new is added, he tends to go through a period of anxiety, regression and he becomes verbally aggressive, at times physically aggressive, self-destructive and has a difficult time with being able to cope until the responsibility is significantly modified in some way and he is provided with a significant amount of emotional support, or the responsibility is ultimately removed from his life….Historically, Josh has not been able to actually "complete" a program or responsibility he has begun due to anxiety (including school programs, previous job trial he has tried in the past, etc.).

…

Josh presents as a very bright and pleasant capable person who is much more affected by his disability than what appears on the surface. Josh has much intent to want to complete the tasks he begins and wants to succeed but remains hindered by the amount of anxiety he has when he attempts new adult responsibilities and life skill tasks.

(ECF No. 6-9 at 2.) Parrish explained, however, that McCormack has made progress with managing his anxiety. (Id.)

During the relevant time period, i.e., October 24, 2016, through February 8, 2019, McCormack reported to healthcare providers that he denied feeling depressed, anxious, having memory loss, mental disturbance, suicidal ideation, hallucinations, or paranoia. (ECF No. 6-8 at 13 (medical records from McCormack's endocrinologist dated October 7, 2017)); (ECF No. 6-8

at 25 (medical records from McCormack's primary care physician dated June 8, 2018)); (ECF No. 6-8 at 31 (medical records from McCormack's primary care physician dated November 7, 2017)); (ECF No. 6-8 at 61 (medical records from McCormack's endocrinologist dated October 7, 2017); (ECF No. 6-8 at 65 (medical records from McCormack's endocrinologist dated April 24, 2018).)

McCormack's treatment providers described him as: "polite" and "sociable[,]" (ECF Nos. 6-7 at 107, 6-9 at 56); a "very pleasant young gentleman[,]" (ECF No. 6-7 at 112); a "delightful young man[,]" (ECF No. 6-7 at 113); and "cooperative[,]" (ECF No. 6-7 at 202).

By April 2018, Parrish noted that McCormack was "doing very well" and did not engage in any "unsafe behavior" while under the current plan of care; indeed, he demonstrated "safety in the home…100% of the time." (ECF No. 6-9 at 153.) He sometimes became agitated and "a little aggressive" towards walls or furniture, but used coping strategies and "more often" identified his triggers and when he felt anxious. He took walks and talked through his feelings rather than allowing his emotions to escalate into anger. (Id.) McCormack increased his positive-thinking skills and reported increased self-esteem and independence. (Id.) McCormack continued to receive the positive support of his family. (Id.) At the same time, McCormack reported that he did not have any difficulty: concentrating on doing something for ten minutes; remembering to do important things; analyzing and finding solutions to problems in day-to-day life; learning a new task; generally understanding what people say; or starting and maintaining a conversation. (ECF No. 6-9 at 155.)

### G. Mental Residual Functional Capacity Assessment form dated December 2016 by Dr. Jon Vigna

Dr. Jon Vigna ("Dr. Vigna"), a psychiatrist, completed a mental residual functional capacity assessment of McCormack dated December 30, 2016. (ECF No. 6-3 at 3-14.) Dr. Vigna

considered the McCormack's medical record and opined that McCormack is not disabled. (Id. at

14.) Dr. Vigna wrote:

> The claimant's ability to understand, remember and carry out complex or detailed instructions is limited, however, the claimant would be expected to understand and remember simple, one and two-step instructions. The [c]laimant is able to carry out very short and simple instructions. The claimant is capable of asking simple questions and accepting instruction. ADL's and social skills are functional from a psychiatric standpoint. The claimant would be able to make simple decisions. Review of the medical evidence reveals that the claimant retrains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks.
>
> Based on the evidence of record, the claimant's statements are found to be partially consistent.
>
> Due to the ability to understand and remember one and two-step instructions, the claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from the impairment. THE CLAIMAINT IS CAPABLE OF PERFORMING SIMPLE, ROUTINE TASKS IN A STABLE ENVIRONMENT.
>
> The most recent GAF was considered and given appropriate weight in this assessment. A GAF rating is only a snapshot opinion about the level of functioning. It is one opinion that is considered with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind a GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis. No such explanation was provided here.

(ECF No. 6-3 at 12.)

### H.  Testimony by Vocational Expert

Edelman testified before the ALJ. (ECF No. 6-2 at 83.) Edelman testified that McCormack

could be employed as a floor waxer, hand packager, or in industrial cleaning. (Id. at 84.) He

testified that one absence per month is permissible in those jobs and more than once per month is

unacceptable. (Id.) With respect to arriving at the workplace late or leaving early, Edelman

testified:

It really depends on the employer. It could be either. I would suggest that if it's more than an hour, then it could count as an absence—less would probably count as time off task if it was under 10%[.]

(ECF No. 6-2 at 84.)

## IV.    The ALJ's Decision[3]

The ALJ concluded that McCormack "has not been under a disability within the meaning of the Social Security Act since October 24, 2016, the date the application was filed." (ECF No. 6-2 at 28.) The ALJ applied the five-step process set forth in the Social Security Act to determine whether McCormack is disabled. (Id. at 29 (citing 20 C.F.R. § 416.920(a)).)

With respect to step one, i.e., "whether the claimant is engaging in substantial gainful activity[,]" the ALJ concluded that McCormack did not engage in substantial gainful activity since October 24, 2016. McCormack was employed after that date, but his employment did not rise to the level of substantial gainful activity. (Id. at 30 (citing 20 C.F.R. § 416.971, et seq.).)

With respect to step two, i.e., "whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe[,]'" (ECF No. 6-2 at 29 (citing 20 C.F.R. § 416.920(c)), the ALJ opined that McCormack has the following severe impairments: autism spectrum disorder, major depressive disorder, and anxiety disorder. (ECF No. 6-2 at 30.) The ALJ opined that these impairments—either singly or in combination—are severe because "they cause limitations or restrictions having more than a minimal effect on the claimant's ability to perform basic work activities[,]" e.g., "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling or mental functions such as understanding, remembering, and carrying our instructions, use of judgment, responding

---

[3]       This section sets forth the general conclusions of the ALJ. The evidence relied upon for those conclusions will be discussed in greater detail in the discussion section of this opinion.

appropriately to supervision, coworkers and usual situations or dealing with changes in a routine work setting." (ECF No. 6-2 at 31 (citing 20 C.F.R. § 416.923; SSR 85-28).)

With respect to step three, the ALJ opined that McCormack "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (ECF No. 6-2 at 32 (citing 20 C.F.R. §§ 416.920(d), 416.925, and 416.926).) The listings in issue are listings 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 12.10 (autism spectrum disorder). A disability is found if the claimant satisfies the criteria set forth in paragraphs A and B of listings 12.06, 12.08, or 12.10. The ALJ, however, focused upon the paragraph B criteria for those listings, which are the same for each of those listings. The ALJ explained that to satisfy the paragraph B criteria, there must be "at least one extreme or two marked limitations in a broad area of functioning[,]" i.e., "understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." (ECF No. 6-2 at 32.) The ALJ found that McCormack did not have extreme or marked limitations in any of the foregoing four areas, and, therefore, he does not have an impairment or combination of impairments that meets or medically equals the severity of listings 12.08 or 12.10.

A disability for anxiety and obsessive-compulsive disorders is found if the claimant satisfies the criteria set forth in paragraphs A and B or A and C of listing 12.06. The ALJ, therefore, considered whether McCormack's impairments satisfied the "paragraph C" criteria of listing 12.06, which considers whether a claimant's mental disorder is "serious and persistent[,]" i.e., whether the claimant attends ongoing mental health treatment and has achieved only marginal adjustment. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ focused the discussion on

whether McCormack has achieved marginal adjustment. The ALJ explained that despite McCormack's diagnoses, he is able to "bathe and dress himself without help, prepare simple meals, play multiple instruments, play video games, go grocery shopping, and do chores." (ECF No. 6-2 at 34.) McCormack is able to work and participate in social events and attends therapy and takes walks with his friends. Based upon the foregoing, the ALJ explained that McCormack "has not achieved only marginal adjustment when changes or increased demands led to exacerbation of his symptoms and signs and to the deterioration of his functioning." (ECF No. 6-2 at 34-35.) The ALJ concluded that McCormack did not satisfy paragraphs B or C of listing 12.06, and, therefore, does not have an impairment or combination of impairments that meets or medically equals the severity of listing 12.06.

With respect to step four, the ALJ found that McCormack has the residual functional capacity to perform a full range of work at all exertional levels with nonexertional limitations. (ECF No. 6-2 at 35.) The ALJ followed a two-step process to reach this conclusion. First, he considered "whether there is an underlying medically determinable physical or mental impairment…that can be shown by medically acceptable clinical or laboratory diagnostic techniques…that could reasonably be expected to produce the claimant's pain or other symptoms." (ECF No. 6-2 at 35.) Second, the ALJ evaluated the extent of McCormack's symptoms to determine the extent to which they limit his functional limitations. (Id.)

With respect to the first step, the ALJ found that McCormack and his mother testified that McCormack's anxiety, autism, or depression cause the following symptoms: unable to do simple acts of daily living; laying on the couch; agitation; physical aggression; inability to work a full workday; unmanageable anxiety from environmental changes and social interactions; and impaired ability to complete tasks, concentrate, understand, follow instructions, and get along

with others. (ECF No. 6-2 at 36.) The ALJ concluded that McCormack's medically determinable impairments could reasonably be expected to cause the foregoing symptoms. (Id.) The ALJ found, however, that the symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (Id.)

The ALJ acknowledged the incidents that resulted in the police being called and McCormack's hospitalizations because of his anxiety and that McCormack was anxious and depressed leading up to the hearing before the ALJ. The ALJ noted that McCormack dropped a college class and ended a relationship with his significant other. (ECF No. 6-2 at 36.) The ALJ found, however, after consideration of the entire record that McCormack's symptoms "are generally well maintained." (Id.) The ALJ noted that McCormack's treatment provider notes show that McCormack's symptoms are not disabling. (Id.) McCormack during the relevant time period denied feeling depressed, anxious, or having suicidal ideation, which is evidence that his symptoms may not be as persistent as argued on behalf of McCormack. (ECF No. 6-2 at 36.) Despite a treating psychologist opining that McCormack's anxiety hinders his ability to complete new adult tasks, other evidence in the record showed that McCormack engages in a "somewhat normal level of daily activity[,]" e.g., playing video games, playing multiple instruments, cooking, mowing the lawn, attending school, and some employment. (Id.) The ALJ noted that McCormack is high-functioning on the autism spectrum, scored an 8 on the Patient Health Questionnaire-9, and that having a routine helped his symptoms. (Id. at 36-37.) McCormack's symptoms were treated with medication and therapy; indeed, he showed "significant improvement" when taking Ativan. (Id. at 37.) Treatment notes showed that McCormack made progress in using coping skills and managing his anxieties. (Id.)

Based upon the foregoing, the ALJ found that the medical evidence did not support a finding that McCormack's symptoms were sufficiently intense, persistent, or limiting to support a finding of disability. (ECF No. 6-2 at 37.) The ALJ explained, however, that McCormack has "substantial issues" (his anxiety causing aggressive outbursts) that warrant limitations in his residual functional capacity. The ALJ explained that McCormack's

> ability to work is limited to understanding, remembering, and carrying out simple instructions and performing simple routine tasks such as those akin to work requirements at the SVP level of one or two; low stress work environment meaning no production rate pace work but rather goal oriented work; occasional and routine changes in the work setting with routine changes defined as that which does not require alteration in work method; and no short or precision deadlines. Additionally, the claimant had aggressive outbursts that resulted in police contract; however, the claimant normally presented as pleasant and polite (Exhibits *SF/2;* 6F/2, 3; 8F/3; 10F/4; and 13F/55). Therefore, the undersigned finds that the claimant's ability to work is limited to no work-related interaction with the public, and occasional and superficial interaction with the coworkers and supervisors.

(ECF No. 6-2 at 37.) The ALJ "gave great weight" to the Mental Residual Functional Capacity Assessment form dated December 2016 by Dr. Vigna. Dr. Vigna reviewed McCormack's medical record, "has an understanding of Social Security disability program policies and their evidentiary requirements," and concluded that McCormack "is capable of performing simple, routine tasks, in a stable environment." (Id.)

The ALJ gave "little weight" to the testimony by McCormack's mother because her testimony was contradicted by the other evidence of record. (Id. at 38.) For similar reasons, the ALJ gave less weight to McCormack's Global Assessment of Functioning Score ("GAF") and more weight to the other evidence of record discussed in the ALJ's findings. (Id.)

The ALJ concluded that—in reliance on the testimony of Edelman—jobs exist in the national economy that are fitting to McCormack's age, education, work experience, and residual functional capacity, i.e., floor waxer, industrial cleaner, and hand packager. (ECF No. 6-2 at 39.)

Based on that information, the ALJ concluded that a finding of "not disabled" is appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines. (Id.) The ALJ found McCormack is not disabled under § 1614(a)(3)(A) of the Social Security Act. (Id.)

## V.   Legal Standard

If the Appeals Council denies a request for review of an ALJ's decision, the decision of the ALJ becomes the final decision of the Commissioner. Sims v. Apfel, 530 U.S.C. 103, 106–07 (2000). The recipient of an adverse final decision of the Commissioner may seek judicial review in a district court. 42 U.S.C. § 405(g) (2006). Any finding of fact by the ALJ that is supported by substantial evidence is conclusive. 42 U.S.C. § 405(g).

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... It is more than a mere scintilla but may be somewhat less than a preponderance of the evidence.... In the process of reviewing the record for substantial evidence, [the court] may not weigh the evidence or substitute [its] own conclusions for those of the fact-finder.

Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir.2005) (internal quotations and citations omitted).

## VI.   Discussion

A disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical ... impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive disability benefits, a claimant must have a severe impairment that makes him unable to do past relevant work or other substantial gainful work available in the national economy. Id. A severe impairment is one which significantly limits one's ability to do basic work activities. Id. § 416.920(c). A substantial gainful activity is any work that involves significant and productive physical or mental duties and is done for pay or profit. Id. § 416.910. Past relevant work is any substantial gainful

activity performed within the last fifteen years which lasted long enough for the claimant to learn how to do it. Id. § 416.960(b)(1).

To evaluate a claim for SSI benefits, the Social Security Administration follows a five-step sequential evaluation process. Id. § 416.920(a)(1). First, it must be determined whether the claimant is currently doing any substantial gainful activity. Id. § 416.920(a)(4)(i). If he is currently doing any substantial gainful activity, then his claim is denied. Id. Otherwise, the inquiry proceeds to the second step, where the evaluator determines whether the claimant has any severe impairment. Id. § 416.920(a)(4)(ii). If he does not have a severe impairment, then the claim is denied. If the evaluator determines the claimant has a severe impairment, the inquiry proceeds to the third step, where the evaluator determines whether any of the claimant's impairments is equivalent to one of the listed impairments. Id. § 416.920(a)(4)(iii). If the claimant has any of the listed impairments, he is considered disabled, and the inquiry ceases. Id. Otherwise, the inquiry proceeds to the fourth step, where the evaluator determines the claimant's residual functional capacity ("RFC") and whether the claimant can return to his past relevant work. Id. § 416.920(a)(4)(iv). If the claimant can return to work, he is not disabled, and the inquiry ceases. Id. Otherwise, the inquiry proceeds to the fifth and final step, where the evaluator determines whether the claimant can adjust to any other substantial gainful work available in the national economy. Id. § 416.920(a)(4)(v). If the claimant can adjust to other work, then he is not disabled. Id. If he is unable to adjust to other work, he is disabled, and is eligible for benefits. Id. The claimant bears the burden of proof with respect to the first four steps. Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir.2007). If the claimant meets that burden, the burden shifts to the Commissioner with respect to the fifth step. Id. at 92.

McCormack argues that this court "should reverse the Commissioner and order the award of benefits or remand this matter to the ALJ for further and…appropriate consideration of the evidence and testimony provided." (ECF No. 10 at 1.) According to McCormack, the ALJ erred by:

1.  finding that McCormack's severe impairments did not meet or equal a listed impairment;

2.  relying upon an RFC that does not properly assess all McCormack's impairments; and

3.  failing to consider the totality of Edelman's testimony.

(ECF No. 10.) The Commissioner argues that the ALJ's determination that McCormack is not disabled is supported by substantial evidence, and, therefore, this court should enter summary judgment in favor of the Commissioner. The parties' arguments and the applicable law are addressed below.

### A. ALJ's finding that McCormack's severe impairments did not meet or equal a listed impairment.

McCormack argues that the ALJ's decision at step three that McCormack's severe impairments do not meet or equal a listed impairment is erroneous. The Commissioner disagrees and argues that the ALJ's step-three analysis and conclusions that McCormack's severe impairments are not listed impairments and do not equal a listed impairment are supported by substantial evidence of record.

"In order to qualify for benefits at step three of the sequential evaluation process, a claimant must match or equal a listed impairment." Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992). As discussed above, the claimant has the burden at step three to prove his or her severe impairment matches or equals a listed impairment. Poulos, 474 F.3d at 92. With respect to listed impairments, a claimant cannot satisfy his or her burden by showing only that he or she has

a diagnosis of the same name as a listing, 20 C.F.R. § 404.1525(d); rather, "[t]o meet the requirements of a listing, [the person claiming disability] must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." Id. In other words, "'[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992) (quoting Sullivan v. Zebley, 493 U.S. 521, 529 (1990)).

Here, the ALJ concluded that McCormack's severe impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 12.10 (autism spectrum disorder). A disability for anxiety and obsessive-compulsive disorders is found if the claimant satisfies the criteria set forth in paragraphs A and B or A and C of listing 12.06. A disability for personality and impulse-control disorders is found if the claimant satisfies the criteria set forth in paragraphs A and B of listing 12.08. A disability for autism spectrum disorder is found if the claimant satisfies the criteria set forth in paragraphs A and B of listing 12.10. The paragraph B criteria are the same for each of these listings. The ALJ, therefore, focused the analysis on whether McCormack satisfied the paragraph B criteria for these listings and the paragraph C criteria for listing 12.06. The ALJ did not set forth an analysis about the paragraph A criteria for any of these listings.

The B criteria for these listings is as follows:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

　　1. Understand, remember, or apply information (see 12.00E1).

　　2. Interact with others (see 12.00E2).

　　3. Concentrate, persist, or maintain pace (see 12.00E3).

22

    4.   Adapt or manage oneself (see 12.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The C criteria for 12.06 (anxiety and obsessive-compulsive disorders) is as follows:

C.  Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

    1.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

    2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Whether the ALJ's conclusions with respect to the paragraph B and C criteria are supported by substantial evidence of record will be addressed below.

### 1.  Paragraph B criteria

#### a.  McCormack's ability to understand, remember, or apply information

With respect to McCormack's ability to understand, remember, or apply information, the ALJ found that he has a mild limitation in this area. (ECF No. 6-2 at 32-33.) The ALJ reasoned that although McCormack's mother testified that McCormack required reminders to take his medication, the medical evidence did not show any serious deficit in long-term or short-term memory, insight, or judgment; indeed, McCormack plays multiple instruments, plays video games, performs household chores, and appeared capable of understanding the hearing process before the ALJ. (Id.) McCormack also reported to his treatment providers that he did not have significant difficulty in understanding or remembering. (Id.)

23

McCormack in his brief in support of his motion for summary judgment argues:

> [T]his area of function also considers as significant the ability to recognize and correct mistakes; sequence multi-step activities; and use reason and judgment to make decisions. The adaptive parts of this area of function and the ability to recognize and correct are what would be difficult for Mr. McCormack, as Dr. Slater [sic] and Ms. Parrish both noted.

(ECF No. 10 at 14.) The ALJ recognized, however, that this area includes "abilities such as learning and understanding terms, instructions, and procedures, following oral instructions to carry out a task, describing work activity to someone else, asking and answering questions and providing explanations, recognizing a mistake and correcting it, identifying and solving problems, …[and] using one's judgment to make work-related decisions." (ECF No. 6-2 at 33.) The ALJ considered Parrish's treatment records, which included McCormack's self-assessments in which he indicated that he did not have "significant difficulty in generally understanding and remembering." (Id.)

McCormack in support of his argument also cites to a diagnosis letter by Dr. Slider dated July 9, 2021 (ECF No. 6-2 at 9-14), that was not provided to the ALJ. Also included in the record before this court are three other documents that McCormack did not present to the ALJ: a letter dated July 16, 2021, from Susan Radio, an academic, life skills, and social support coach, ("Radio's letter"); a letter dated July 15, 2021, from Parrish ("Parrish's updated letter"); and an adaptive behavior assessment dated March 9, 2021 of McCormack by James. D. Petrick, a clinical neuropsychologist ("Petrick's assessment"). (ECF No. 6-2 at 15-17, 20-23.) It is improper for a district court in making its substantial evidence review to consider evidence that was not presented to the ALJ. In those circumstances, the district court may "remand [the case] to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001).

When a claimant proffers new evidence not presented to the ALJ, a reviewing court's determination about whether to remand to the Commissioner is governed by Sentence Six of § 405(g) of the SSA. Salem v. Colvin, Civ. Action No. 15-1453, 2017 WL 363011, at *4 (W.D. Pa. Jan. 24, 2017) (citing Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001)). Sentence Six provides that the court may order remand "only upon a showing that there is *new* evidence which is *material* and that there is *good cause* for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (emphasis added); see Matthews, 239 F.3d at 593 (holding that "when the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand . . . only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ (Sentence Six review)."). "[A] claimant must satisfy all three requirements of Sentence Six (new, material and good cause) in order to justify a remand" under Sentence Six of 42 U.S.C. § 405(g). Matthews, 239 F.3d at 594. The burden of showing new and material evidence and good cause for delay is on the party seeking review. Platt v. Berryhill, Civ. Action No. 16-537, 2017 WL 1927721, at *3 (W.D. Pa. May 10, 2017) (stating that "[a]ll three requirements must be satisfied by a plaintiff to justify remand.").

Sentence Six requires that "the evidence must first be 'new' and not merely cumulative of what is already in the record." Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984); Haney v. Comm'r of Soc. Sec., Civ. Action No. 13-3033, 2014 WL 2916454, at *14 (D.N.J. June 26, 2014) ("Evidence must raise new issues or clarify existing ones, so as to go beyond merely reiterating past findings through new sources.")  New evidence must "not [be] in existence or available to the claimant at the time of the administrative proceeding." Sullivan v. Finklestein, 496 U.S. 617, 626 (1990); Chalfant v. Colvin, Civ. Action No. 15-1555, 2016 WL 7104387, at *3 (W.D. Pa. Dec. 6, 2016) (finding a medical report not to be "new" because it was

"merely indicative of [the claimant's] condition during and based upon records in existence

during the relevant period of time but crafted after the ALJ issued his decision.").

"[T]he materiality standard requires that there be a reasonable possibility that the new

evidence would have changed the outcome of the [ALJ's] determination." Szubak, 745 F.2d at

833.  Courts have found this to be "an arguably lax standard." Shuter, 537 F. Supp. 2d at 757; see

Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir.1985) (holding that the burden of showing

materiality, namely the reasonable possibility standard, "is not great."). The evidence must relate

to the time period for which benefits were denied. Matos v. Kijakazi, No. CV 21-02024 (FLW),

2022 WL 1134995, at *8 (D.N.J. Apr. 18, 2022). Indeed, the Third Circuit Court of Appeals has

explained: "An implicit materiality requirement is that the new evidence relate to the time period

for which benefits were denied, and that it not concern evidence of a later-acquired disability or

of the subsequent deterioration of the previously non-disabling condition." Szubak v. Sec'y of

Health & Hum. Servs., 745 F.2d 831, 833 (3d Cir. 1984).

Section 405(g) requires "good cause for failure to incorporate such evidence into the

record in a prior proceeding." 42 U.S.C. § 405(g).  Plaintiff must show "some justification for

the failure to acquire and present such evidence" or else "[a] claimant might be tempted to

withhold medical reports, or refrain from introducing all relevant evidence, with the idea of

'obtaining another bite of the apple'" as an "end-run method of appealing an adverse ruling by

the Secretary." Szubak, 745 F.2d at 833, 34; Matthews, 239 F.3d at 595 (describing good cause

as a "good reason" for failing to timely submit evidence). "Congress intended [the good cause]

aspect of § 405(g) to be sparingly applied." Haney, 2014 WL 2916454, at *15. In Chandler v.

Commissioner of Social Security, the plaintiff failed to satisfy the good cause requirement

"because she [had] not explained 'why she did not attempt to obtain [the] evaluation[s] at a time

when [they] could be considered by the ALJ.'" 667 F.3d 356, 361 (3d Cir. 2011) (quoting

Matthews, 239 F.3d at 595); Morrow v. Colvin, Civ. Action No. 15-1335, 2017 WL 118405, at

*1 (W.D. Pa. Jan. 12, 2017) (where a "[p]laintiff has not offered any explanation for why the

evidence was not submitted to the ALJ . . . there is no basis for finding the required 'good cause'

"); Waugaman v. Astrue, Civ. Action No. 08-1548, 2009 WL 2177219, at *6 (W.D. Pa. July 22,

2009) ("[w]ithout an explanation for the delay in obtaining and submitting the report, the court

can only find that the factors indicating the propriety of a remand based on new evidence have

not been met.").

Here, even if McCormack could show that Dr. Slider's diagnosis letter, Radio's letter,

Parrish's updated letter, and Petrick's assessment are *new* evidence*, he did not make a showing

that the letters are material or there exists good cause for his failure to submit the evidence to the

ALJ. With respect to materiality, the letters and assessment are not limited to the time period for

which benefits were requested, i.e., October 24, 2016, through February 8, 2019, and it is unclear

which opinions may relate to that time period; indeed, Radio did not begin working with

McCormack until August 2020. (ECF No. 6-2 at 15.) Under those circumstances, McCormack did

not satisfy his burden to show that the letters and assessment are material to his request for benefits

during the time period in issue, i.e., October 24, 2016, through February 8, 2019. McCormack also

did not make any showing that good cause exists for failing to request the letters and assessment

until *after* the ALJ rendered the decision in this case. Based upon the foregoing, the court cannot

consider the letters or assessment and will not remand this case back to the ALJ for consideration

of that evidence.

The ALJ considered the evidence of record, including the testimony presented at the

hearing and the medical evidence from McCormack's treatment providers, and analyzed

McCormack's ability to understand, remember, or apply information. The ALJ's finding that

McCormack has a mild limitation in this area is based upon substantial evidence of record.

### b. McCormack's ability to interact with others

McCormack in his brief in support of his motion for summary judgment argues that ALJ

erred by concluding that McCormack has only a moderate limitation in this area. McCormack

explained:

> Contrary to the ALJ's assessment of only a moderate impairment, the
> records and Mr. McCormack's history over time make plain that he is at least
> markedly, if not extremely, impaired in this area. The evidence available to the ALJ
> makes plain that he has significant difficulties in managing himself in response to
> criticism and challenges and that he is extremely argumentative. His diagnoses of
> intermittent explosive disorder and his run-ins with the police and his aggressive
> interactions within his family are specific examples. Mr. McCormack simply is not
> able to function in this area independently, appropriately, effectively, and on a
> sustained basis. The evidence of record verifies that he has little or no ability to
> cooperate or handle conflicts free of excessive irritability, sensitivity,
> argumentativeness, or suspiciousness. This is more than a moderate deficit.

(ECF No. 10 at 14.) The ALJ acknowledged the testimony by McCormack's mother that

McCormack can be unpleasant and has a difficult time getting along with others; indeed,

McCormack was hospitalized prior to March 2017 on two occasions, became overly aggressive,

kicked a hole in the wall, and threatened to set himself on fire. (ECF No. 6-2 at 33.)

McCormack's treatment providers and teachers, however, noted that he is cooperative, pleasant,

and did not consistently have deficiencies in eye contact or conversation. (Id.) The ALJ

emphasized that McCormack testified that he got along with coworkers at Snapology, played

video games socially online, and participated in the band at his church. (Id.) The ALJ explained

that McCormack's impairments are treated conservatively with medication and therapy and that

a review of the entire record shows that his symptoms are "generally well maintained" and

Parrish noted that McCormack is progressing in the management of his anxiety. (ECF No. 6-2 at

36.) Based upon the foregoing, the ALJ found that McCormack had a moderate limitation in this area. (Id.)

The court finds that the ALJ sufficiently discussed McCormack's ability to interact with others and supported the conclusion that he has a moderate limitation in this area with substantial evidence in the record. McCormack asks this court to reweigh the evidence to reach a conclusion different than that of the ALJ. This court, however, may not reweigh the evidence. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). "The presence of evidence in the record that supports a contrary conclusion[, however,] does not undermine the [ALJ's] decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009). McCormack essentially is seeking that this court reweigh the evidence. The ALJ's finding that McCormack has a moderate limitation in this area is based upon substantial evidence of record.

### c. McCormack's ability to concentrate, persist in task performance, and maintain pace

With respect to McCormack's ability to concentrate, persist in task performance, and maintain pace, McCormack in his brief in support of his motion for summary judgment argued that the evidence about McCormack's school experience showed that he has "difficulties in this domain." (ECF No. 10 at 15.) McCormack explained:

> He had special instruction, and needed assistance beyond the regular classroom, additional time for work, and perhaps as important, continuous and significant emotional support. Clearly, Josh is capable of playing several musical instruments and video games, but he testified to the ALJ that after a period—never more than a couple of hours—he loses focus and interest even in those things. His work schedule at the time of hearing was two days per week and no more than four hours, based on the evaluation of his situation by his vocational counselor and after several years of preparedness.

(ECF No. 10 at 15.) Contrary to McCormack's arguments, the ALJ considered McCormack's school history; indeed, he explained that McCormack's most recent grades were at the A or B level and that the evidence showed that McCormack completed his homework and participated in class. (ECF No. 6-2 at 34.) The ALJ explained that there was no evidence of record that McCormack "needed redirection during conversations…[or]…had a prescription for or required attention deficit medication." (Id.) McCormack's "Full Scale IQ" was in the average range. The ALJ considered McCormack's mother's testimony, but weighed against that evidence the mental status examinations that showed McCormack has "intact thought process…[and] full orientation." (Id.) The ALJ emphasized that McCormack plays video games, watches videos on the internet, and makes music on the computer, which requires concentration. (Id.)  Based upon the foregoing evidence, the ALJ concluded that McCormack had a moderate limitation in this area of functioning. (Id.)

The court finds that the ALJ sufficiently discussed McCormack's ability to concentrate, persist in task performance, and maintain pace and supported the conclusion that McCormack has a moderate limitation in this area with substantial evidence in the record. McCormack again requests this court to reweigh the evidence. In other words, McCormack asks this court to find that McCormack's school performance and need for assistance during that time period outweighs the evidence that McCormack participates in activities requiring concentration and that he has motivation, intact thought process, and full orientation. Based upon the record, the ALJ's conclusion that McCormack has a moderate limitation in this area is supported by substantial evidence of record.

### d.  McCormack's ability to adapt and manage himself

McCormack argued that the ALJ erred by concluding that McCormack is moderately impaired in his ability adapt or manage himself. (ECF No. 10 at 15.) McCormack explained:

> The medical evidence submitted supports a finding that the ALJ erred in failing to find…McCormack markedly to extremely impaired in this area. The ALJ ignored or misapprehended the significant discussion in the record that explains that when his anxiety is heightened or he is unable to regulate his emotions, he loses control [of] his behavior and therefore cannot adapt or manage himself. He has repeated episodes where his psychologically based symptoms have interrupted his activities of daily living, as well as his family life.

(ECF No. 10 at 15.)

With respect to McCormack's ability to adapt and manage himself, the ALJ noted that McCormack's mother testified that he handles changes in routine and new situations poorly; indeed, changes increase McCormack's anxiety, police have been called, and he has been hospitalized because of his mismanagement of his anxiety. (ECF No. 6-2 at 34.) The ALJ explained, however, that McCormack denied suicidal and homicidal ideation to his treatment providers, McCormack was found to have normal behavior (which indicates an ability to manage himself), and his treatment providers noted that he had a linear and goal-directed thought process. (Id.) Based upon the foregoing information, the ALJ found McCormack has a moderate limitation in this area. (Id.)

Contrary to McCormack's argument, the ALJ considered the medical evidence in the record, including the events resulting in McCormack's hospitalization. The ALJ explained, however, that McCormack's impairments are treated conservatively with medication and therapy and a review of the entire record shows that his symptoms are "generally well maintained" and he is progressing in the management of his anxiety. (ECF No. 6-2 at 36.) Based upon the foregoing, the court finds that the ALJ sufficiently discussed McCormack's ability to adapt and manage himself and supported the conclusion that McCormack has a moderate limitation in this area with

evidence in the record. McCormack again requests this court to reweigh the evidence. The ALJ's conclusion that McCormack has a moderate limitation in this area is supported by substantial evidence of record.

### e. Conclusion with respect to the paragraph B criteria

Based upon the foregoing discussion, the ALJ's conclusion that McCormack does not have an extreme impairment in one of the foregoing categories or marked impairments in two of the foregoing categories is supported by substantial evidence of record. Thus, the court cannot conclude that McCormack's impairments meet or medically equal the severity of the impairments listed in 12.08 or 12.10.

### 2. Paragraph C criteria

As discussed above, the paragraph C criteria for 12.06 (anxiety and obsessive-compulsive disorders) is as follows:

> C.   Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
>> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>>
>> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations provide the following with respect to C(1):

> b. The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder (see 12.00D). We consider that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition. We will consider periods of inconsistent treatment or lack of compliance with treatment that may result from

your mental disorder. If the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by this paragraph.

20 C.F.R. Pt. 404, Subpt. P, App. 1. The regulations provide the following with respect to C(2):

> c. The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

Id.

McCormack argues that the ALJ erred by concluding that the paragraph C criteria for listing 12.06 are not satisfied in this case. According to McCormack, he satisfies the "serious and persistent" requirement of paragraph C because he has "been under consistent medical treatment" for his autism since he was 11 years old. (ECF No. 10 at 16.) He argues that he satisfies C(1) because he relies upon "significant psychosocial supports and mental health treatment…to achieve the levels where" he can participate in society. (Id.) He argues that he satisfies C(2) because—as evidence by his outburst on the way to his second day of work at Snapology—he has achieved only marginal adjustment, i.e., his "adaptation to the requirements of daily life is fragile." (ECF No. 10 at 17.)

The ALJ did not specifically address the "serious and persistent" requirement of paragraph C or the requirements of C(1). The ALJ concluded, however, that McCormack did not

satisfy paragraph C(2) because he has achieved greater than "marginal adjustment." (ECF No. 6-2 at 34-35.) The ALJ's conclusion with respect to C(2) is based upon the evidence that McCormack: dresses and bathes himself without help; prepares simple meals; plays multiple instruments; plays video games; goes grocery shopping; mows the lawn; works; participates in social events, e.g., playing cards and performing in the band at church; attends therapy; plays music; and takes walks with friends. (Id.)

Based upon the foregoing, the ALJ sufficiently discussed the paragraph C(2) criteria and supported the conclusion that McCormack has achieved more than "marginal adjustment" with evidence of record. According to McCormack, the court should give more weight to the acute incidents resulting in McCormack's hospitalization and the police being called than to the evidence of record about McCormack's capabilities inside and outside his home. The court, however, cannot reweigh the evidence, and is satisfied that substantial evidence supports the conclusion of the ALJ that McCormack does not satisfy the paragraph C criteria of listing 12.06.

### 3. Listing 12.04

McCormack argues that along with listings 12.06, 12.08, and 12.10, the ALJ should have considered listing 12.04 (depressive, bipolar, and related disorders). (ECF No. 10 at 17-18.) To meet or equal listing 12.04, a claimant must satisfy the criteria set forth in paragraphs A and B or the criteria set forth in paragraph A and C. The criteria set forth in paragraphs B and C of listing 12.04 are the same criteria set forth above in listings 12.06, 12.08, and 12.10. The court already concluded that the ALJ's conclusions with respect to paragraphs B and C are supported by substantial evidence of record. Under those circumstances, McCormack's argument that the ALJ should have also considered listing 12.04 is moot.

### 4. Conclusion with respect to Step Three

Substantial evidence of record supports the ALJ's conclusions that McCormack does not satisfy the paragraph B criteria of listings 12.06, 12.08, and 12.10 or the paragraph C criteria of listing 12.06. McCormack's motion for summary judgment with respect to step three will be denied on that basis.

### B. The ALJ's RFC properly included consideration of McCormack's severe impairments.

With respect to step four,[4] the ALJ must assess a claimant's RFC, which is defined as "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Shearn v. Kikakazi, Civ. A. No. 21-584, 2022 WL 591988, at *9 (M.D. Pa. Jan. 25, 2022) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 131 (3d Cir. 2000)). To determine the claimant's RFC, the ALJ "considers all…the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step  two of his or her analysis." Id. (citing 20 C.F.R. § 404.1545(a)(2)). The ALJ follows a two-step process:

> (1) [I]t must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques— that could reasonably be expected to produce the claimant's pain  or  other symptoms.
>
> (2) [O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities.

Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed.Reg. 34483, 34485 (July 2, 1996); Grant v. Comm'r of Soc. Sec.,

---

[4]     The Third Circuit Court of Appeals has recognized that "[t]here is some ambiguity in the case law as to whether RFC is assessed at step four or at the end of step three." Hess v. Comm'r Soc. Sec., 931 F.3d 198, 202 n.2 (3d Cir. 2019). The court of appeals found it "simpler to consider the RFC assessment with step four" and, therefore, "treat[ed] the RFC assessment [in Hess] as part of step four." Id.

No. CIV.A. 09-6296 SDW, 2010 WL 4810702, at *5 (D.N.J. Nov. 17, 2010). The ALJ's RFC

assessment "will not be set aside if it is supported by substantial evidence." Shearn, 2022 WL

591988, at *9 (citing Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002)).

One district court has explained:

It is well settled that the final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner, and even "treating source opinions ... are never entitled to controlling weight or special significance." Breen v. Comm'r of Soc. Sec., 504 F. App'x 96, 99 (3d Cir. 2012) ( citing SSR 96–5p, 1996 WL 374183 (July 2, 1996)). As noted above, the residual functional capacity is defined as the most a claimant can do in a work setting despite the physical and mental limitations resulting from all of her impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ must use all relevant evidence in the record to make the RFC assessment.

In reviewing the record to make the RFC assessment, the ALJ must take into account all the medical opinion evidence along with all other relevant evidence in the record, 20 C.F.R. § 404.1527(b), and must allocate weight to each medical opinion upon which it relies. Weidman v. Colvin, 164 F. Supp. 3d 650, 662 (M.D. Pa. 2015). The Commissioner's regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). Only licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered "acceptable medical sources." See 20 C.F.R. §§ 404.1513(a) & 416.913(a).

Any medical opinion from an acceptable medical source, unless it is designated a controlling treating medical opinion, must be analyzed according to factors set forth in 20 C.F.R. § 404.1527(c). These factors include the examining and treating relationship; the length and frequency of the relationship; the extent and nature of the relationship; the amount of objective medical evidence supporting the opinion; consistency with the entire record; specialization of the medical professional; and other factors that tend to support or contradict an opinion. Id.

Smith v. Comm'r of Soc. Sec., No. CV 19-20682, 2020 WL 7396355, at *8 (D.N.J. Dec. 17, 2020).

Here, the ALJ found the following with respect to McCormack's RFC:

[McCormack] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: work is limited to understanding, remembering, and carrying out simple

36

instructions and performing simple routine tasks such as those akin to work requirements at the Specific Vocational Preparation (SVP) level of one or two; no work-related interaction with the public; occasional and superficial interaction with the coworkers and supervisors; low stress work environment meaning no production rate pace work but rather goal orientated work; occasional and routine changes in the work setting with routine changes defined as that which does not require alteration in work method; and no short or precision deadlines.

(ECF No. 6-2 at 35.) At step one with respect to the RFC, the ALJ found that McCormack's medically determinable impairments "could reasonably be expected to cause the alleged symptoms" complained about by McCormack and his mother. (Id. at 36.) The ALJ explained that McCormack testified that:

- anxiety prevents him from doing even simple acts of daily living;

- his anxiety will reduce him to laying on the couch and can make him agitated;

- his anxiety can cause him to become physically aggressive;

- he would be unable to work a full workday because of his anxiety and depression; and

- his depression causes him to feel hopeless.

(ECF No. 6-2 at 35-36.)

The ALJ explained that McCormack's mother testified that McCormack's

- autism and anxiety limit his ability to work because he is unable to manage his anxiety that arises from environmental changes, social interactions and demands, and processing information;

- concentration becomes impaired when his anxiety is too high; and

- impairments affect his ability to complete tasks, concentrate, understand, follow instructions, and get along with others.

(Id.) The ALJ concluded that based upon the medical evidence of record, McCormack's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Id. at 36.) The

ALJ recognized that "[t]hroughout the adjudicatory period" McCormack had a history of lashing out verbally or physically when his anxiety was high; indeed, there was law enforcement contact, he kicked a hole in the wall of his family home, and he destroyed his mother's and sister's cellular telephones. (Id.)

Despite these incidents, however, the ALJ found that the record showed that McCormack's symptoms are "generally well maintained." (Id.) The ALJ cited the following in support of that conclusion:

- McCormack denied feelings of depression, anxiety, or suicidal ideation to treating sources;

- he often presented as pleasant to treating sources;

- McCormack engages in many adult responsibilities and life skill tasks, which require the mental capabilities requisite for obtaining and maintaining employment, such as, cooking, mowing the lawn, attending school, some work, playing video games, and playing multiple instruments;

- treating sources opined that McCormack is high-functioning on the autism spectrum;

- McCormack scored an 8 on the Patient Health Questionaire-9, which indicates his function is not impaired;

- McCormack reported having a routine helped his symptoms, e.g., he was comfortable with his routine at City Connections;

- his impairments were treated conservatively with medication and therapy, and he showed significant improvement with Ativan;

- McCormack showed progress in therapy, e.g., he worked on his ability to cope with anxiety and reported more confidence and comfort in talking with his family, increased positive thinking skills, and conquering some independent skills; and

- Dr. Vigna, who reviewed McCormack's medical record, opined that McCormack is capable of performing simple, routine tasks, in a stable environment.

(ECF No. 6-2 at 36-38.) The ALJ also gave "little weight" to the opinion of McCormack's mother because she reiterated McCoramck's testimony about his symptoms. (Id. at 38.)

      The ALJ recognized that McCormack's GAF were between 45 and 70. (ECF No. 6-2 at 38.) The ALJ explained, however, that "little weight" was given to the GAFs because each one "represents a particular clinician's subjective evaluation at a single point in time." (Id.) The ALJ could not determine from the GAFs what kind of limitations or abilities were contemplated by McCormack's scores or how they "necessarily relate to…[his] ability to hold a job." (Id.) The ALJ found the GAF scores in this case were outweighed by other evidence in the case, which the ALJ found to be "more informative" with respect to the existence of impairments that may interfere with McCormack's ability to work. (Id.)

      The ALJ concluded, however, that McCormack's impairments limit his ability to work. The ALJ described those limitations as follows:

> - understanding, remembering, and carrying out simple instructions and performing simple routine tasks;
>
> - a low stress work environment;
>
> - no production rate pace work
>
> - goal-oriented work;
>
> - occasional and routine changes (which do not require alteration in work method) in the work setting;
>
> - no short or precision deadlines;
>
> - no work-related interaction with the public; and
>
> - occasional and superficial interaction with the coworkers and supervisors.

(ECF No. 6-2 at 38.)

McCormack in his brief in support of his motion for summary judgment argues that the ALJ erred in formulating his RFC because the ALJ did not consider the "critical mental abilities" set forth in Social Security Administration's Program Operations Manual System ("POMS") 25020.010. (ECF No. 10 at 19.) The Third Circuit Court of Appeals has explained:

> We have characterized the POMS as " 'the publicly available operating instructions for processing Social Security claims.' The Supreme Court has stated that '[w]hile these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect.' " Kelley v. Comm'r of Soc. Sec., 566 F.3d 347, 350 n.7 (3d Cir. 2009) (alteration in original) (citations omitted). The POMS is especially entitled to respect in the present context, where the issue is whether the limitation chosen by the ALJ captured the claimant's capabilities and conveyed them to the vocational expert, given that the POMS establishes the generally understood meaning of terms within the social security regulatory framework.

Hess v. Comm'r Soc. Sec., 931 F.3d 198, 213 (3d Cir. 2019).

POMs 25020.010 provides that a person must have the following mental abilities to performed unskilled work:

a. remember work-like procedures (locations are not critical).

b. understand and remember very short and simple instructions.

c. carry out very short and simple instructions.

d. maintain attention for extended periods of 2-hour segments (concentration is not critical).

e. maintain regular attendance and be punctual within customary tolerances. (These tolerances are usually strict.) Maintaining a schedule is not critical.

f. sustain an ordinary routine without special supervision.

g. work in coordination with or proximity to others without being (unduly) distracted by them.

h. make simple work-related decisions.

    i. complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (These requirements are usually strict.)

    j. ask simple questions or request assistance.

    k. accept instructions and respond appropriately to criticism from supervisors.

    l. get along with coworkers or peers without (unduly) distracting them or exhibiting behavioral extremes.

    m. respond appropriately to changes in a (routine) work setting.

    n. be aware of normal hazards and take appropriate precautions.

DI 25020.010 Mental Limitations.

    McCormack's argument that the ALJ failed to address sufficiently the POMs mental abilities listed above is belied by the record before this court. The ALJ specifically mentioned the POMs mental abilities listed above when addressing the paragraph B criteria to which those mental abilities relate and addressed the evidence of record that corresponded with each of those mental abilities. For example, the ALJ wrote that the first paragraph B criteria of "understanding, remembering, or applying information" includes abilities

> such as learning and understanding terms, instructions, and procedures, following oral instructions to carry out a task, describing work activity to someone else, asking and answering questions and providing explanations, recognizing a mistake and correcting it, identifying and solving problems, or using one's judgment to make work-related decisions.

(ECF No. 6-2 at 33.) The foregoing list of abilities includes the mental abilities listed in paragraphs a, b, c, h, and j of POMs 25020.010.

    The ALJ reasoned that despite McCormack's mother's testimony that McCormack needs reminders to take his medication, the medical records before the ALJ did not evidence any "serious deficits in long-term memory, short-term memory, insight,...[or] judgment." (Id.) The ALJ concluded that based upon McCormack's every-day activities, which included household chores,

playing video games and multiple instruments and McCormack's representations to his treating sources that he did not have difficulty in understanding or remembering, that he had only a mild limitation in this area. (Id.) Under those circumstances, the ALJ's consideration of the mental abilities set forth in POMs 25020.010 a, b, c, h, and j was sufficient and supported by substantial evidence of record.

The ALJ acknowledged that the consideration of the second criteria in paragraph B, i.e., the ability to interact with others, included consideration of

> abilities such as cooperating with others, asking for help when needed, handling conflicts, voicing one's own point of view, initiating or sustaining conversation, responding to social cues or requests and criticism, and avoiding excessive sensitivity or argumentativeness.

(ECF No. 6-2 at 33.) The ALJ discussed the evidence that corresponded with the foregoing list of abilities. The foregoing list of abilities includes the mental abilities listed in paragraph k of POMs 25020.010, i.e., the ability to accept instruction and respond appropriately to criticism from supervisors. The ALJ acknowledged that McCormack could be unpleasant, have a difficult time getting along with others, and had been hospitalized for being overly aggressive, kicking a hole in the wall of his family home, and destroying his mother's and sister's cellular telephones. The ALJ also considered the medical records, which described McCormack as pleasant, polite, and cooperative, reports from McCormack's teachers that he was pleasant and cooperative, McCormack's ability to get-along with his coworkers at Snapology, and ability to play video games online and play instruments in a band. The ALJ acknowledged that McCoramck's limitation in these areas was moderate; indeed, the RFC provides that McCormack cannot have "work-related interaction with the public…[and only] occasional and superficial interaction with the coworkers and supervisors." (ECF No. 6-2 at 35.) Based upon the foregoing, the ALJ sufficiently considered

the mental ability in paragraph k of POMs 25020.010 in assessing McCormack's RFC and supported the RFC with substantial evidence.

The ALJ acknowledged that the third criteria of paragraph B, i.e., McCormack's ability to concentrate, persist in task performance, and maintain pace, included consideration of the following mental abilities:

> initiating and performing a task, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring or avoiding distractions while working, changing activities or work settings without being disruptive, working close to or with others without interrupting or distracting them, sustaining an ordinary routine and regular work attendance, and working a full day without excessive breaks.

(ECF No. 6-2 at 33-34.) The foregoing list of mental abilities includes consideration of paragraphs d, e, f, g, i, l, m of POMs 25020.010. The ALJ recognized that McCormack's mother testified that McCormack had difficulty maintaining concentration and completing tasks. The ALJ also recognized, however, that the treatment records from the treating sources provided that McCormack had "intact thought process…[and] full orientation." (ECF No. 6-2 at 34.) Based upon the foregoing, the ALJ found that McCormack had a moderate limitation in this area; indeed, the RFC provides that McCormack work must be limited to "low stress work environment meaning no production rate pace work but rather goal orientated work[,]…occasional and routine changes in the work setting[,] with routine changes defined as that which does not require alteration in work method[,]…and no short or precision deadlines." Based upon the foregoing, the ALJ sufficiently addressed paragraphs d, e, f, g, i, l, m of POMs 25020.010 and supported the RFC with substantial evidence.

The ALJ recognized that the four criteria of paragraph B, adapting or maintaining himself, included consideration of the following mental abilities:

responding to demands, adapting to changes, managing psychiatric symptoms, distinguishing between acceptable and unacceptable work performance, setting realistic goals, making plans independently, maintaining basic hygiene and appropriate attire, and being aware of normal hazards and taking precautions against them.

(ECF No. 6-2 at 34.) The foregoing mental abilities include consideration of the mental abilities set forth in paragraphs i, l, m, and n of POMS 25020.010. The ALJ considered the evidence of record that corresponds with the foregoing mental abilities. The ALJ acknowledged McCormack's mother's testimony that he handles stress poorly and that unknown situations cause fear and anxiety for him. The ALJ recognized that the police were called when McCormack handled his anxiety poorly and he was hospitalized for making threats against himself and others. The record, however, does not support a conclusion that McCormack had any marked deficiencies in hygiene or wearing appropriate attire. McCormack's treating sources reported that he had goal-directed thought process and normal behavior, which supported the ALJ's conclusion that McCormack can manage himself. The ALJ concluded that McCormack has a moderate limitation in this area; indeed, the RFC provides that McCormack's work must be limited to, among other things, understanding, remembering, and carrying out simple instructions and performing simple routine tasks, a low stress work environment, involving goal-oriented work, occasional and routine changes in the work setting with routine changes, no short or precision deadlines, and minimal contact with others. Based upon the foregoing discussion, the ALJ provided a sufficient explanation of the RFC with respect to paragraphs i, l, m, and n of POMS 25020.010 and substantial evidence of record supports his conclusions with respect to the RFC.

Because the record reflects that the ALJ sufficiently considered POMS 25020.010, explained the conclusions with respect to the RFC, and supported the conclusions with substantial evidence, McCormack's motion for summary judgment with respect to this issue must be denied.

**C. The ALJ properly considered the totality of Edelman's testimony.**

McCormack argues that the ALJ ignored Edelman's testimony that: "even employers of SVP 1 or 2 level employees" will not tolerate more than one absence per month; being more than an hour late for work may constitute an absence; and the employees are expected to be productive 90% of the work day. (ECF No. 10 at 21.) According to McCormack, the ALJ should have concluded that McCormack could not satisfy these requirements because: (1) there is no evidence of record that McCormack could satisfy these requirements; (2) Parrish's report shows that McCormack could not satisfy these requirements; and (3) McCormack's experience at Snapology shows that McCormack could not satisfy these requirements.

With respect to an ALJ's reliance upon vocational experts and the use of hypothetical questions, the Third Circuit Court of Appeals has explained:

> "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments. Thus the expert must have evaluated claimant's particular impairments as contained in the record."

Rutherford v. Barnhart, 399 F.3d 546, 553–54 (3d Cir. 2005) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)). In other words, "'a hypothetical question posed to a vocational expert must reflect *all* of a claimant's impairments[.]'" Id. (quoting Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)). "All" impairments, however, means only those "credibly established limitations." Id.

The Third Circuit Court of Appeals has explained:

Our cases have established some guidelines as to when a limitation is credibly established, and the governing regulations have something to say on that score as well (see especially Regs. §§ 945, 929(c) and 927). Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (Burns, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (Plummer, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993); Reg. § 929(c)(4)). Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it (Reg. § 929(c)(3)).

Rutherford, 399 F.3d at 554. Here, McCormack essentially argues that the record shows that he is incapable—because of his severe limitations—of only having one day absence of work each month. According to McCormack, that limitation should have been presented to Edelman, and, because the limitation was not presented to Edelman, the ALJ may not rely upon Edelman's testimony that jobs exist in the national economy suited to McCormack.

First, McCormack relies upon Parrish's report to show that McCormack could not satisfy the attendance requirements presented by Edelman. As discussed above, in August 2018, Parrish reported that McCormack's autism makes it more difficult for him to manage his anxiety. He struggles when faced with new responsibilities. She explained:

When something new is added, he tends to go through a period of anxiety, regression and he becomes verbally aggressive, at times physically aggressive, self-destructive and has a difficult time with being able to cope until the responsibility is significantly modified in some way and he is provided with a significant amount of emotional support, or the responsibility is ultimately removed from his life…Historically, Josh has not been able to actually "complete" a program or responsibility he has begun due to anxiety (including school programs, previous job trial he has tried in the past, etc.).

…

46

> Josh presents as a very bright and pleasant capable person who is much more affected by his disability than what appears on the surface. Josh has much intent to want to complete the tasks he begins and wants to succeed but remains hindered by the amount of anxiety he has when he attempts new adult responsibilities and life skill tasks.

(ECF No. 6-9 at 2.) Parrish explained, however, that McCormack has made progress with managing his anxiety. (Id.) McCormack also relies upon the testimony by his mother with respect to his second day of work at Snapology in which he threatened to take his mother's car on the way to work.

The ALJ, however, considered the foregoing evidence and found that despite the acute incidents during which McCormack was unable to cope with his anxiety, police were called, and hospitalization ensued, "a longitudinal review of the medical evidence indicates that…McCormack's symptoms are generally well maintained." (ECF No. 6-2.) The ALJ directly quoted Parrish's report. The ALJ wrote: "A treating psychologist described the claimant as having intent to complete the task he begins and wants to succeed but was hindered by the amount of anxiety he has when he attempts new adult responsibilities and life skill tasks." (ECF No. 6-2 at 36.) The ALJ, however, rejected this opinion because the evidence of record showed that McCormack was involved in a "normal level of daily activity and interaction[,]" the skills for which "replicate those necessary for obtaining and maintaining employment." (Id. at 36.) The ALJ explained that McCormack's symptoms were conservatively treated with medication and therapy; indeed, the treating sources reported McCormack's progress with his ability to cope with his anxiety. (Id. at 37.) The ALJ also explained that great weight was given to Dr. Vigna's opinion that McCormack was capable of work subject to limitations. (Id. at 37-38.)

With respect to the incident the second day of work at Snapology, there is evidence that McCormack escalated that day, but there is no evidence of record that he was late for work or

missed work because of that incident. Under those circumstances, a limitation with respect to work attendance was not credibly established before the ALJ.

Based upon the foregoing discussion, the hypothetical posed to Edelman that did not include a limitation about work attendance was based upon substantial evidence. The ALJ sufficiently explained the reasons for the hypothetical presented to the ALJ. It was not error for the ALJ to rely upon Edelman's testimony as the vocational expert in this case. McCormack's motion for summary judgment will be denied with respect to this issue.

### VII.    Conclusion

As explained in the foregoing opinion, substantial evidence supported the decision by the ALJ to deny disability benefits to McCormack. McCormack's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the decision of the ALJ will be affirmed. An appropriate order and judgment follows.

BY THE COURT,

Dated: June 3, 2022                                /s/ JOY FLOWERS CONTI
                                                   Joy Flowers Conti
                                                   Senior United States District Court Judge